IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 25, 2008

## STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES
### v. J.C., ET AL.

**Appeal from the Juvenile Court for Hawkins County**
No. HJ-06-1107      Kenneth N. Bailey, Jr., Judge Sitting By Interchange

---

**No. E2008-00510-COA-R3-PT - FILED AUGUST 14, 2008**

---

The State of Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of J.C. ("Father") and B.C. ("Mother") to the minor children S.A.C., K.O.C., and J.S.C. ("the Children"). After trial, the Juvenile Court entered an order finding and holding, *inter alia*, that clear and convincing evidence existed to terminate Father's and Mother's parental rights under Tenn. Code Ann. §§ 36-1-113(g)(1), (g)(2), and (g)(3), and that termination was in the best interests of the Children. Father and Mother appeal to this Court. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

Dana Lee Scott, Mount Carmel, Tennessee for the Appellant, B.C.

Gerald T. Eidson, Rogersville, Tennessee for the Appellant, J.C.

Robert E. Cooper, Jr., Attorney General and Reporter, and Douglas Earl Dimond, Senior Counsel General Civil Division, for the Appellee, State of Tennessee Department of Children's Services.

# OPINION

## Background

In September of 2006, DCS filed a petition ("the Petition") seeking to terminate Father's and Mother's parental rights to the Children. The Petition alleged, in part, that the Juvenile Court had adjudicated the Children dependent and neglected twice, that the Children had been taken into State custody originally in December of 2004, that the Children were returned to their parents' custody in November of 2005, and that the Children were taken into State custody a second time in January of 2006. The Children have been in foster care continuously since January 26, 2006. The case was tried without a jury in January and February of 2008.

Jeff and Donna Hill, husband and wife, are the foster parents to the Children. At trial, Mr. Hill testified that they have had the Children for a little over two years this time, and that he and his wife also had the Children the first time the Children were in State custody. Mr. Hill testified:

> We would see the kids after they had went home on the weekends and stuff alone, and, you know, kind of give the basis of what we were seeing. We would sometimes keep them on the weekends for the parents or we would take them to church on Sundays. And most of the time we would - - if we went and got them on a Sunday, we would have to take them home, give them baths, clean them up, put clean clothes on them. And, you know, the kids were just - - I just can't really describe this kind of disarray. You know, they always needed to be cleaned up. I know we picked them up on a Sunday to go to church and they have, like, eczema and psoriasis, skin conditions and they - - the [K.O.C.], was just miserable with that. And this was kind of leading up to the before we - - to the point we got them. I mean, kind of taking it one by one when we took custody of them on the 26th, there was a lice issue with the two girls. Yeah, just - - I don't want to say just - - I'm trying not to be very broad - - just needed to be cleaned up. They were - - I know the first night we had them back home, they ate everything in the house. You know, just hungry. [J.S.C], the baby, when we got him, he was just about unresponsive as far as playing with him or I mean, he just laid there, which he's doing a lot better now. But the back of his head was flat where he had been left laying on his back so long. The girls, like I say, they were - - we'd bathe them, cleaned them up. There was a lice issue with their hair. Of course, we - - you know, I don't know how else to describe it.

Mr. Hill testified that now the Children are doing well. They are happy and healthy and the oldest, the only one old enough to attend school, enjoys school and loves to read. The middle child attends pre-school. Mr. Hill and his wife want to adopt all three of the Children.

Mrs. Hill also testified at trial. Mrs. Hill testified that she and her husband cared for the older two children when Mother was giving birth to the youngest and stated:

> we had to pay day care, I can't remember the amount, to even let them come there because she was - - they were behind in the payments. So we paid, like, so much for

them to go there because I was working at the time.… [T]he daycare was available during the day, but it was so far behind that they weren't going to allow them to come, so we had to pay that.

When asked if she has concerns about the Children being returned to Father and Mother, Mrs. Hill testified:

Yes. It's not fathomable to me and we've had them this long and they feel like they're ours. They're home with us and I just don't see - - I mean, I don't know their circumstances now, but if it's as they were at that time, you know, I would have every concern, and just, you know, transportation to school. They were missing school, and, I mean, I just - - I don't know, but I know they've been without them so they're ours. They only know us.

Delores Jean Pearcy, Mother's mother, testified at trial. Ms. Pearcy sees the Children often and testified that she spoke with them the night before trial. Ms. Pearcy testified that she thinks the Children are better off with the foster parents than they were with Mother and Father.

Sonya Moore works at Allandale Early Learning Center, a daycare center that the Children attended. Ms. Moore testified that Father and Mother were behind in child care payments to the daycare center when they still had custody of the Children. Father and Mother paid $15 per week for child care, and the State paid the remainder. Ms. Moore testified:

The week of 12/19/05 [Father and Mother] owed $10.00 for that week. We had some parents at the center that helped [Mother] that volunteered to help pay her debt to help the children remain in a stable - - just coming everyday on a consistent basis. So they took some of the debt. One parent donated $100.00, you know. So we put this on. We help with diapers and things like that to try to help, which we would any parent that was in a hard time.

Ms. Moore also testified that there were some problems with the oldest child having recurring head lice while the Children were in Mother and Father's custody and that the Center had problems with Mother after the Children were taken into State custody. Ms. Moore testified that Mother showed up at the Center in March of 2006 and became angry at the assistant director when told she could not see the Children. Ms. Moore also described another incident that occurred on March 10, 2006 stating:

[Mother] and [Father] arrived at the day care with Susan Bishop. Jeana and I were getting off the bus. Jeana stopped at the door. Everybody was in the foyer. The social worker asked Jeana if she could take [J.S.C.] back? Before she could say she would, [Mother] stepped in and said, "I can take him back by myself. I know where he goes." She looked at Jeana and said in a very smart voice, "If I can, if that's okay?" Because of the door incident, and before anybody could say or do anything, she had [K.O.C.] and [Father] had [J.S.C.] and they went back through the pre-K.

-3-

I went ahead and did my bus walk and went to the office. [Mother] and [Father] were standing in the pre-K with the social worker. We couldn't tell what they were saying or anything. We could just tell they were both very upset. We started looking for the paperwork that we had got from Rita Manis stating [Mother and Father] couldn't be on the premises. I wasn't sure if it was okay with the social worker there, because with the social worker there, it kind of threw us off. By the time we found it, [Mother] was in the office. She was really mad. [[Father] and the social worker was in the lobby. She was very hateful and had some words to say and it's in quotes. "I have some problems with this place. I am going to get my kids back. You all or the Hills are not taking care of them. [K.O.C.] and [S.A.C.] both have nits. [J.S.C.] and [K.O.C.] both have bad diaper rashes. [K.O.C] must not have put her pull-up on because she had blue fuss." She talked about bumps on [J.S.C.] where he was broke out and was just upset feeling like they weren't being taken care of. All the while, we found the paperwork and we gave it to the social worker, Susan, stating they were not supposed to be here. She apologized, and said it wouldn't happen again.… We had the children checked for diaper rash and everything that was accused and nits and everything.… [A]s soon as [Mother and Father] left the building, Ms. Kim and I examined [K.O.C.'s] hair and found no evidence of nits or lice at this time. We took [K.O.C.] to the bathroom. We had several teachers witness. We checked the genital area to make sure there was no blue fuss or anything. We made sure and checked the diaper to make sure they didn't have a diaper rash. [K.O.C] had a pull-up on. We took her to the bathroom and made sure the pull-up wasn't wet. Everything seemed fine and in order. Since [Mother] had told us that the kids had nits, we checked all three hair. [S.A.C.'s] hair, found no nits again. They only thing was a piece of hair spray on a whole piece of hair and it moved so it wasn't a nit. Documentation from each teacher that checked the children.

Ms. Moore testified regarding an incident in June or July of 2006 when the Allandale Early Learning Center was put on shutdown and the police and DHS were called after Mother made a threat involving the Children. The Allandale Early Learning Center did not keep the Children any more after the incident involving the alleged threat.

Natasha Bice teaches kindergarten at Mount Carmel Elementary School and taught the oldest child, S.A.C., first during the 2004/2005 school year, and again when S.A.C. was retained in kindergarten for a second year. Ms. Bice testified:

In '04/'05 [S.A.C.] was with her parents, yes. She started the school year after it had begun. She started, I think, the 27th of August so she started a couple of weeks into the school year. And in the second year that I had her, she started in foster care, was sent back to the parents and then went back into foster care.

Ms. Bice testified that when S.A.C. was retained in kindergarten, Ms. Bice requested to have S.A.C. back in her classroom again to help with the transition. Ms. Bice testified that S.A.C. was retained

in kindergarten because "she wasn't able to complete her checklist for kindergarten skills mostly due to attendance." Ms. Bice testified:

> When [S.A.C.] started school, it was a rough transition for her. She was very upset emotionally. She would cry. She didn't want to stay. We overcame that hurdle and she loved school, but she, because of her lack of attendance, that is why I think she fell behind and became less successful.

Ms. Bice testified that S.A.C. had a number of un-excused absences "which means there was no parent note or a medical excuse sent to explain the absence." She also stated: "[S.A.C.'s] report cards were not always returned. Items were not always returned. Things were missing or they were lost." Ms. Bice testified that when S.A.C. was in her parent's custody she wasn't bringing snacks to class like the other children. In addition, Ms. Bice testified "I let [S.A.C.] sleep through circle times because she was so tired and a five year old is not ready to take on all the information that we require them to know. It was better off to rest. So yes, I have observed her sleep through my class." Ms. Bice also testified that during the time period from November of 2005 through January of 2006, when S.A.C. was in her parents' custody, Ms. Bice sent S.A.C. to the school nurse several times for head lice or nits.

S.A.C. was in foster care at the beginning of her second year of kindergarten and Ms. Bice testified:

> The second year she was fine, and she was better able to transition into school, and it's difficult for most children to get that routine back in after summer or at the beginning of school. But she did fine. She was more rested. She was excited and happy and none of the anxiety that I had seen the prior fall was there.

Ms. Bice testified that when S.A.C. was in the custody of her foster parents she was not tired or sleepy. She stated: "[S.A.C.] was ready for her day. She had her items. She always was prepared as far as smiling and happy and like you want your five year olds in your classroom to be."

Sis Dickinson is a CASA volunteer who has worked with Mother and Father since December of 2004. Ms. Dickinson visited Mother's home during a scheduled visit when she first started working with Mother and Father and found "it was adequate for the care of the children. There was adequate staples, things of that nature in a disarray, clutter, that type thing, but it was clean." However, Ms. Dickinson testified:

> Different times throughout this case it was very hard to find either party. Sometimes it took me weeks to find their whereabouts. And I think I even mentioned in one of my Court hearings that I would appreciate it if the Court would ask them to contact me, because it was so hard to get a hold of them.… They originally lived in a trailer that was - - I believe it was housing. They got a subsidy there, and they were kicked out of there for the nonpaying of rent.

The trailer was the first place where Ms. Dickinson visited Father and Mother. Ms. Dickinson testified:

> At one point they were staying with [Mother's] mother. At one point they were staying with [Father's] mother. At another point [Mother] had related to me that they actually went back and was staying in the trailer with no electricity and what have you. And I could not honestly tell you their whereabouts today.

Ms. Dickinson testified that around Thanksgiving of 2005, Father called her and related that Mother had an altercation with his mother and that Mother had hit his mother. Ms. Dickinson asked for a review of the case after that incident and the result was that CASA was asked to remain involved in this case. Ms. Dickinson testified that there was another incident when Father was hit over the head with a pipe and was taken to the hospital. Mother originally told Ms. Dickinson that she and Father were in the car and were stopped at a red light when someone opened up the door of the vehicle and hit Father with a pipe, but Mother later admitted to Ms. Dickinson that this story was not true. Mother would not tell Ms. Dickinson what actually happened. Father told the DCS case worker, Ms. Bishop-Augusta, that: "He was sitting at Krispy Kream. They were just sitting there, him and [Mother], and somebody just came up and smacked a bar in the window and hit him."

Mother told Ms. Dickinson that Mother was bipolar. Ms. Dickinson testified that Mother acted different when not on her medication and stated: "She was disoriented. It was just, you know, it's hard to explain, but it was always like night and day when she was not on her medication. She would do things that one might not seem (sic) normal." Ms. Dickinson testified: "I know one particular time [during December of 2005] when she was not on her medication, they did not have a lot of means, but she had gotten paid and went and got a tattoo when the children needed coats."

Ms. Dickinson testified that even though Mother and Father still are married, Mother has had at least three other boyfriends. Ms. Dickinson has not had contact with Mother and Father for six to nine months. She testified that she believes that it would be in the best interest of the Children for them to remain with the foster parents.

Susan Bishop-Augusta is the case manager with DCS who has worked on this case since the Children first came into State custody in December of 2004. Ms. Bishop-Augusta testified that the Children were taken into custody at that time because Mother tested positive for THC, amphetamines, opiates, and meth, and Father tested positive for THC. The Children were in State custody from December of 2004 through November of 2005. During that time period, Mother and Father worked the permanency plan and regained custody of the Children.

In January of 2006, CASA requested a review due to concerns for the Children and an investigation was begun. The Children were found to be dependent and neglected and were taken

back into State custody. Another permanency plan for each child was completed in March of 2006 ("the Plan")[1]. Ms. Bishop-Augusta testified regarding the Plan stating:

> The outcomes, [Father] and [Mother] will provide documentation that they are physically able to care for their children. This includes a release of medical records and a signed statement they are following their medical providers' prescribed treatment. Number 2, [Father] and [Mother] will demonstrate the ability to consistently meet their children's financial needs for six months and ongoing. Number 3, [Father] and [Mother] will maintain sobriety for at least three months and ongoing. To assist an A&D assessment by Frontier Health. [Father] and [Mother's] mental health needs will be assessed and follow-up as determined appropriate. [Father] and [Mother] will participate in random drug testing. [Father] and [Mother] to demonstrate their ability to provide appropriate care for their children. [Father] and [Mother] will refrain from illegal criminal activity. [Father] and [Mother] will demonstrate the ability to manage their behavior in a manner that does not place either of the children or them at risk of harm. [Father] and [Mother] will comply with all Court orders and including child support.

Father and Mother signed the Plan.

Ms. Bishop-Augusta testified that Father and Mother never provided proof of maintaining a job and being able to meet the Children's financial needs. Mother told Ms. Bishop-Augusta that Mother worked at Burger King and also sat with an elderly lady. However, Mother never provided proof of any employment when asked to provide such proof. Ms. Bishop-Augusta was told that Father worked at Piccadilly for two weeks, but Father also never provided proof of any employment. Father told Ms. Bishop-Augusta at one point that he did not have a driver's license because "he wasn't able to pay for it. He wasn't able to provide insurance to pay for that."

Ms. Bishop-Augusta testified that Father and Mother did not maintain sobriety for three months and ongoing. Ms. Bishop testified that during Father and Mother's visit with the Children on August 14, 2006: "I noticed a difference. [Mother] was very manic at the visit, just very high strung. And [Father] was very talkative, and so that's when I felt like I needed to drug test them, and that's when they came up positive." DCS did a random drug test and Mother and Father both tested positive for THC, cocaine, and opiates. Ms. Bishop-Augusta testified that Father drove to the August 14th visit. After Mother and Father tested positive for drugs, DCS filed a motion to suspend visitation. Mother and Father failed to attend the hearing on the motion to suspend visitation, which was held on August 31, 2006, and the Juvenile Court entered an order on September 27, 2006 suspending visitation and specifically finding, *inter alia*, that Father and Mother did not show concern for this matter.

---

[1] A separate permanency plan was created for each child and each of these plans was introduced at trial. All three plans are substantially similar. For ease of reference only we refer to the three plans as "the Plan."

Ms. Bishop-Augusta testified that before visitations were suspended, Father and Mother did not show up prepared for visitations. She stated: "They didn't bring a diaper bag. I told them they had to bring a diaper bag. You know, bring an extra set of clothes, change them. I mean, I told them what they needed to do for the Solutions' worker." During the period between May and August of 2006, Mother was to contact Ms. Bishop-Augusta to arrange visitation. Ms. Bishop-Augusta testified that she got approximately two phone messages from Mother, and attempted to call back but never was able to speak with Mother. Mother never went to the DCS office during that time to request visitation.

Ms. Bishop-Augusta testified that an A&D assessment was scheduled for Father and Mother at Frontier Health, but that Father and Mother did not obtain TennCare so the Frontier assessments never were done. Ms. Bishop-Augusta testified that she set up an appointment for Father and Mother to get TennCare, but Father and Mother did not attend this appointment. Ms. Bishop–Augusta testified that Father and Mother never made application for TennCare. Ms. Bishop-Augusta testified that if Father and Mother had applied for and been denied TennCare, DCS could have paid for services.

Ms. Bishop-Augusta testified that Father and Mother did not maintain stable housing. Ms. Bishop-August did not do a home visit because she "never did know where they were at." Ms. Bishop-Augusta sent a certified letter when Father was living with his mother and discovered that Father had moved. She testified that she never knew where they lived after that time because Father and Mother did not tell her.

At one point while the Children were in foster care, Mother was charged with driving on a revoked license. In addition, Mother was in jail in Virginia in July of 2006. Ms. Bishop-Augusta admitted that Mother is a good mother when she is sober. However, she testified that she believes it is in the best interest of the Children for Mother and Father's parental rights to be terminated so the Children can be adopted.

Rita Manis, a team leader for DCS who supervised Ms. Bishop-Augusta in working this case, also testified. Ms. Manis testified she spoke to Mother on April 20, 2006:

> for about an hour on the phone and what she started out saying to me was, she said that [Father] had beaten her up pretty bad about three days earlier. She thought that he had knocked her kneecap out of place and had left numerous bruises on her.… She had told me that she was tired of lying and of trying to cover up things that she and [Father] were doing. She told me that she knew that they were about to lose the kids and have their parental rights terminated. She told me that she and [Father] had separated and that she wanted a divorce. She had stated that she was getting a place of her own and was supposed to be starting CNA classes that next week. She was crying on the phone and she had begged for a visit. And we told her that we weren't trying to keep her children from her or from them seeing the children. But they hadn't called to set up any visits and the phone numbers that we had for them were not good phone numbers. They had either been disconnected or it was a wrong number. So I did set up a visit for them or for [Mother] because she and [Father]

weren't together.… She, during that same conversation, she admitted to me that they'd been evicted from their home for nonpayment of rent, that she had recently taken an overdose of medication and had been in the hospital because [Father] had threatened to leave her and that she had also been smoking marijuana. And she told me that it felt good to get that off her chest.…

The next day Ms. Manis received a phone call from Father requesting a visit and phone calls with the Children. During that phone call:

He asked me if I had heard from [Mother] and I told him that she had called yesterday and he asked me if she had told me that he had beat her up? And I said, "Yes, she did." And he told me that that was not true, that he hadn't seen her in over a week and that he heard that she was staying with another man and that's who had beaten her up.…

Patty Cline a family preservation specialist with Solutions began doing the therapeutic visitations and transport in this case in June of 2006. Father and Mother each were entitled to four one-hour visits per month. Ms. Cline testified that in June of 2006, Father and Mother did one visit and one visit was cancelled because the Children were ill. Mother exercised visitation on June 16, August 14, and August 25 of 2006. Mother cancelled one of her June visits stating there was something wrong with her car and although she said she would call back, Mother did not call again for two or three weeks. Out of ten possible visits, Father exercised four and Mother exercised three.

Karen Thompson, who works for Child Protective Services as an investigator for DCS, received a referral on January 9, 2006 alleging a substantial risk of physical injury to the Children and investigated. Ms. Thompson testified:

My investigation was cut short due to Court involvement that was already in place when I received this referral.… I made numerous attempts to find [S.A.C.] and the family at home and was unsuccessful. I determined that CASA was determined with the family and there was a Court hearing already schedule[d], so I went to Court and met with the family at that time.

Ms. Thompson testified that she attempted to make a home visit "on the 12th, the 13th, the 17th, and the 18th before I saw them at Court on January 19th." Ms. Thompson testified that she spoke with S.A.C. and

[S.A.C.] told me that most of the time her mother was not home. Her father would be asleep after he took pills and she would be responsible for taking care of her younger siblings. And she also told me there was, you know, rarely enough food in the home.… She seemed fairly traumatized. She asked if she could [go] back to live with her foster mother or go to her grandmother's home.

Ms. Thompson testified that her investigation ended when the Children were taken back into State custody.

Mother testified that she was at the meeting where the Plan was formulated, she was not impaired, she did understand everything that was expected of her, and she had a copy of the Plan herself. Mother testified that she lives at 370 Silver Lake Road in an apartment where she has lived for approximately ten months and that she is employed at Food Lion as a deli/bakery associate and has worked there for over six months. Mother claimed that she tried to call Ms. Bishop-Augusta very frequently and even tried calling two or three times a day some days and if she did not reach her would leave messages.

When asked why she and Father had lost their Section 8 housing, Mother testified:

Whenever the children were took for the second time, it wasn't because we weren't paying rent. It was because of accumulated rent that was due that were a Section 8 where jobs would be changed and there would be certain parts amounts where the rent would change and then it wouldn't take effect until the next month. So that balance just accumulated over two years. So it wasn't the fact, like, we all of a sudden stopped paying rent. It was just - - they were getting paid rent by, you know, by myself and [Father] and by Section 8. It was just an accumulated balance is the reason I was terminated.

Mother was asked how many residences she has had since January of 2006. She testified:

April 2006 it was 4000 Brandon Drive. The McKinney Street for two months. I lived in Blountville with Summer for two months.… And then on Willow Street with [Father] from 6/06 to 12/06. And then we got the apartment on Jackson Hollow Road with [Father] from 12/06 to 2/07 and then 327 Oak Street, 2/07 to 1/11 and then currently where I live at now.

Mother admitted that during July of 2006, she stayed at six different residences. At the time of trial, Mother was living with her boyfriend, David Mellons. Mother testified that Mr. Mellons, is twenty-five years old, does not work, and has not worked for a couple of months.

When asked where she has worked since March of 2006, Mother testified:

I worked at Pizza Hut in Allandale. And I worked at Burger King in Allandale until I had to go on maternity leave in August. I worked at Devoted In-Home Health Care from October to January. And I went back to Burger King at Allandale and worked from January to June. I worked in Food City in Blountville from June to July. Sunoco in Colonial Heights from July to September.…And then Pizza Hut in Colonial Heights from September to February. And I worked at Waffle House in Allandale from April to May. Mountaineer in Church Hill, I worked from May to July. Pizza Plus, I worked in Church Hill from May to August. I held down about two or three jobs and once I worked for Home Instead Senior Care from May to June of '07. And Food Lion in Church Hill from August of '07 until now.

When Mother was asked about the discrepancies between her testimony and testimony given by her best friend earlier during the trial, Mother stated: "I'm sure if you could trip me up like you have, I'm sure you did her, yeah."

Mother was asked if she was given a medical release to sign and she stated:

> They actually did, but it was in a way that me, and I assume [Father], also felt that it was by CASA, which - - and there was testimonies that was given…Yeah, but it wasn't DCS themselves, like I said. To our knowledge, it was CASA that was wanting the records.

When asked who gave her the medical release to sign, Mother stated: "No, not Susan, personally.… They were just in the room and Sis was in there. That was one of the times when she had been at the DCS office." Later during trial, Mother agreed that she refused to sign a medical release for DCS.

Mother testified that she has been on her Lithium for her bipolar condition consistently for over a year. Mother testified that she submitted an application for TennCare and was turned down. She stated: "They told me that basically unless I had cancer or I was dying, I did not qualify. And that was the - - that was in October." Mother testified that she applied for Tenn Care in October of 2007. When asked, Mother could not recall whether she made any attempt to apply for Tenn Care while she was working the Plan.

Mother admitted that she does not have a driver's license and stated: "But I can get it back. It was due to a wreck in '97. It's just paying off the restitution and getting insurance."

In July of 2006, Mother went to Virginia with her boyfriend, Doug Deel. Mother testified that while she was in Virginia: "I got arrested on the 14th and was released on the 15th and I stayed at Doug's brother's house and I arrived back in Tennessee and I went to a friend's house in Tennessee, mutual friend of mine and [Father's]." Mother admitted she has been arrested three times since the Plan was entered into.

Mother admitted that in May of 2006 she took a hair follicle test and tested positive for cocaine. On August 14, 2006, she took another drug test and tested positive for cocaine, marijuana, and opiates. Mother was asked who she did drugs with. Mother asked: "What presidence [sic] does that make where my children are concerned with whom I do drugs with?" Mother admitted that she used cocaine with Father. After the hearing on her motion for visitation in September of 2007, Mother was asked to take a drug test and she testified that the test result showed "I was clean." Mother admitted that she does not have a stable home or stable employment and that from March of 2006 through September of 2006 she was not drug free. When asked how often she was using cocaine, Mother stated: "Not very much. My levels was really low. Mine was 805.… It was recreational." Mother admitted that she overdosed in April of 2006. When asked what she is doing to stay drug free, Mother stated: "Just I'm not doing drugs." Mother claims she has been clean for over a year. She admitted that she and Father were doing drugs at home, but only when they lived at Brandon Drive and Jackson Hollow, never in public housing.

-11-

When asked about the altercation with her mother-in-law, Mother testified:

It was the same day that [Father] had surgery over the incident with his face. And when he come in, he was upset. And because he had first told me that he did not want me to come to the hospital with him. And so I did not go because I didn't want to end up getting in trouble or kicked out of the hospital for us ending up getting into an argument. He came in and was kind of upset. And he threw a bottle of water at me. I was laying down on the bed and he come over and pulled the pillow out from underneath my head and he was angry because I was not there. And we were fussing and I went in and tried to get the keys. I was going to just try to avoid conflict and he wouldn't let me get into the car, so I went back in and he stayed outside and he slashed the front left tire on the Corsica and came back in and then by the time he had done that, his mom was - - maybe she was upset also because she didn't - - you know, because he was upset and because we were fussing and were - - you know, I did not go and she got up in my face. And I told her not to get up in my face and, you know, just to calm down, because she was upset and she didn't realize what he had done. She didn't see him throw the bottle of water at me. And I was angry, too. And so she - - you know, we kind of got into it and I left and I drove the car down to the store and I was going to call someone and leave. But I just went ahead and called myself - - I called the law. And they come down there and they ended up, even though I was in the car, of course, they still took me to jail for driving on revoked. And they did mention while I was in the back of the cop car that there was a report talking about - - a report being filed over that. But the cops said they allowed that they did not press charges. And so nothing else come of it.

Mother admitted that this was not the first time she and Father had this kind of altercation. She also admitted that she has filed for an order of protection against Father in the past and that he filed for one against her, and, further admitted that the police had been called in the past for Mother and Father's domestic relations disputes.

When asked why she did not show up on August 31, 2006 for the hearing on the motion to cease visitation, Mother stated:

I thought it was actually in April, but I guess that was when I had the alarm clock set. I was working graveyard and I did not get up and that's when I called Susan and that's when she told me there wasn't anything she could do about it, and they rescheduled a Court date. The lawyers had withdrawed from the case and the best thing for me to do was to seek a lawyer on my own."

After trial, the Juvenile Court entered an Order April 23, 2008 finding and holding, *inter alia*:

Upon hearing of this matter the Court makes the following findings of fact and Conclusions of Law:

-12-

The Petition to terminate the parental rights of [Father] and [Mother] was filed September 25, 2006. The Departtment (sic) of Children's Services alleged grounds of abandonment by failure to visit or only token visitation in the four months immediately proceeding the filing of this action. The proof shows in the four months immediately preceding the filing of this action that [Father and Mother] visited the children only one hour per month and with the time that was available to visit the Children, this amounts to only token visitation. The Department of Children's Services, provided supervised visitation, initially through the department and then through Solutions. Proof showed that [Father and Mother] and Solutions had established a procedure where [Father and Mother] were to call and set up visitation through the Solutions case worker. The case worker for Solutions testified that [Father and Mother] did not call. There was no evidence that there was any impediment to keep them from visiting the Children. The failure to visit was willful.

The Court finds and concludes that the Department of Children's Services has met its burden of proof by clear and convincing evidence that [Father] and [Mother] have abandoned their children by willfully failing to visit or having only token visitation with their children in the four months immediately preceding the filing of this action pursuant to T.C.A. §§ 36-1-113(g)(1) and 36-1-102(1)(A)([i]), -102(1)(C) and -102(1)(E).

* * *

Petitioner Department of Children's Services has alleged grounds of abandonment by [Father and Mother] in failing to provide a suitable home for their children. The proof shows that since the children were removed form (sic) [Father and Mother's] home on January 26, 2006, that at no time have either [Father] or [Mother] together, or individually, provided their children a suitable home. Specifically, [Father and Mother] failed to provide a suitable home in the four months following removal of the children from their home. Proof shows that [Mother] has gone back and forth between her husband and three different boyfriends and has not had housing that was stable when she was with the boyfriends. When she was with [Father], testimony of the maternal grandmother and each of the state's witnesses was that there was domestic violence in the home and that the children were at risk because of this behavior. While apart, proof showed that [Father] had no suitable housing and in fact was living with his mother at the hearing. [Father] offered no evidence to dispute this claim.

The Court finds and concludes that the Department of Children's [S]ervices has proven by clear and convincing evidence that [Father and Mother] have abandoned their children by failing to provide a suitable home, pursuant to T.C.A. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii).

The Tennessee Department of Children's Services has alleged the grounds for termination of substantial non-compliance with the permanency plan for the children.

-13-

The proof shows that a permanency plan [f]or the three children was developed on March 9, 2006. This plan required [Father and Mother] to 1. Provide documentation that they are physically able to care for their children, including a release of medical records and a signed statement that they are following their medical providers' prescribed treatment; 2. To demonstrate the ability to consistently meet their children's financial needs for six months and ongoing; 3. To [m]aintain sobriety for at least three months, in part to assist in an Alcohol and Drug assessment; 4. To have [Father and Mother's] mental health needs assessed and follow-up as determined appropriate and participate in random drug testing; 5. Demonstrate the ability to care for their children; 6. Refrain from illegal activity; and, 7. Demonstrate the ability to control their behavior in a manner that doe[s] not place either of the children or them at risk. The proof further shows that [Father and Mother] understood the conditions of the permanency plan and the criteria for termination of parental rights, having the criteria explained to them by the Court at the adjudicatory hearing and by DCS.

The proof shows [Father and Mother] had had a previous parenting assessment from when the children had been previously removed, but nothing else was accomplished toward requirement 1. Specifically there was no evidence that medical releases were signed or any signed statements from their medical providers. As for demonstrating the ability to meet the financial needs of the children, the proof shows there was no evidence provided to the Department of Children's Services that [Father and Mother] collectively or individually were working, were paying their bills, or were making payments for housing. In fact evidence showed that the foster parents had to pay back bills for daycare incurred by [Father and Mother]. The proof also shows that both parents failed drug tests in March 2006 and August 2006, further the testimony of [Mother] was that she and [Father] had used drugs while they were together. They also failed to complete an alcohol and drug assessment as was required by the permanency plan. The proof shows [Father and Mother] also failed to have their mental health needs assessed even though the Department of Children's Services made appointments to aid them in obtaining TennCare to pay for the assessment. Further the Court finds that although [Mother] and [Father] participated in some drug testing, the tests were positive for illegal drugs. As for demonstrating the ability to care for the children, the proof shows that [Father and Mother] failed to participate in marriage counseling, that there was a marked difference between the condition of the children while the parents had the children that they were dirty, had lice problems, skin problems and were not prepared for class and the educational needs of the children were not being met. The testimony of [Mother] was that she was arrested within two weeks of the permanency plan being established and also that she and [Father] were using cocaine, an illegal activity. The proof shows that [Father and Mother] did not refrain from criminal activity. As to demonstrating the ability to control their behavior so as to not put the children or themselves at risk, the proof shows that [Father and Mother] continued to engage in domestic violence, buy and use illegal drugs, [Father and Mother] have each failed to comply with the requirement to demonstrate that they can control their behavior such as not to put the children or themselves at risk.

The Court finds and concludes that the Department of Children's Services has met their burden of proof by clear and convincing evidence that [Father and Mother] have not substantially complied with the permanency plan., (sic) pursuant to T.C.A. §§ 36-1-113(g)(2) and 37-2-403(a)(2)[.]

The Department of Children's Services has also alleged the grounds of persistence of conditions. The proof shows that the children were removed from [Father and Mother's] home because [Father and Mother] could not provide a safe and stable home for the children. Testimony from the maternal grandmother and from the Solutions case worker, and from the Department of Children's Services personnel showed that there was frequent domestic violence. Further proof showed that there was no marital housing as [Father and Mother] were being evicted at the time of removal. The proof shows that that (sic) there is no marital housing now, and that [Father] is residing with his mother, while [Mother] is living with a boyfriend and that his name is on the lease. She is therefore not in control of the housing. The conditions that necessitated removal still exist and the behavior of [Father and Mother] is such that these conditions will not be rectified any time soon.

The Court finds and concludes that the Department of Children's Services has proven the grounds for termination of parental rights for persistence of conditions, pursuant to T.C.A. §§ 36-1-113(g)(3), by clear and convincing evidence.

The proof shows by clear and convincing evidence that, pursuant to T.C.A. § 36-1-113(i), it is in the best interest of the children, subject of this action, that the parental rights of [Father and Mother] be terminated. Proof shows that the children are in an adoptive home. It is in the best interest of the children that the parental rights of [Father and Mother] be terminated so they can be adopted into a home where they have stable and safe housing. It is in the children's best interest that they be adopted into a home that can provide for the children' financial needs. It is in the children's best interests that they be in [a] home free from criminal activity, unlike the home of their parents where the proof shows illegal drug usage and domestic violence happen frequently. It is in the children's best interest that they be in a home that sends them to school prepared to learn., (sic) unlike the home of [Father and Mother].

The Court finds and concludes that by clear and convincing evidence it is in the best interest of the children that the parental rights of [Father and Mother] be terminated.

Father and Mother appeal the termination of their parental rights to this Court.

**Discussion**

Although not stated exactly as such, Father raises five issues on appeal: 1) whether the Juvenile Court erred in admitting as evidence the Plan and the April 20, 2006 court order entered

-15-

in the dependency and neglect hearing; 2) whether the Juvenile Court erred in terminating Father's parental rights due to willful failure to visit or having only token visitation with the Children in the four months immediately preceding the filing of this action pursuant to Tenn. Code Ann. § 36-1-113(g)(1); 3) whether the Juvenile Court erred in terminating Father's parental rights for failure to provide a suitable home for the Children; 4) whether the Juvenile Court erred in terminating Father's parental rights due to substantial noncompliance with the Plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2); and, 5) whether the Juvenile Court erred in terminating Father's parental rights for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). Mother raises an issue which we restate as: whether the Juvenile Court erred in terminating Mother's parental rights because DCS failed to make reasonable efforts to reunite this family.

We begin by addressing whether the Juvenile Court erred in admitting as evidence the Plan and the Juvenile Court order filed on April 20, 2006 in the dependency and neglect hearing ("the April 20 Order"). As this Court stated in *Delapp v. Pratt*:

> Issues regarding admission of evidence in Tennessee are reviewed for abuse of discretion. *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001). "[T]rial courts are accorded a wide degree of latitude in their determination of whether to admit or exclude evidence, even if such evidence would be relevant." *Id*. Our Supreme Court discussed the abuse of discretion standard in *Eldridge v. Eldridge*, stating:
>
> > Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.
>
> *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).
>
> Appellate courts ordinarily permit discretionary decisions to stand when reasonable judicial minds can differ concerning their soundness. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). A trial court's discretionary decision must take into account applicable law and be consistent with the facts before the court. *Id*. When reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Id*.

*Delapp v. Pratt*, 152 S.W.3d 530, 538 (Tenn. Ct. App. 2004).

-16-

Father lodged a hearsay objection to the introduction of the Plan and the April 20 Order at trial. On appeal, Father argues, in part, that Tenn. R. Evid. 902(4) and Tenn. Code Ann. § 24-6-101(a) "require that the court documents be certified." Father is mistaken. In pertinent part, Tenn. R. Evid. 902 provides:

> **Rule 902. Self-authentication. –** Extrinsic evidence of authenticity as a condition precedent to admissibility is not required as to the following:
>
> * * *
>
> (4) Certified Copies of Public Records. – A copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office (including data compilations in any form), certified as correct by the custodian or other person authorized to make the certification, by certificate complying with paragraph (1), (2), or (3) of this rule or complying with any Act of Congress or the Tennessee Legislature or rule prescribed by the Tennessee Supreme Court.

Tenn. R. Evid. 902(4). In pertinent part, Tenn. Code Ann. § 24-6-101 provides:

> **24-6-101. Copy of judgment without entire record. –** (a) In any litigation, certified copies of final judgments or decrees of any court of record may be used as evidence in such litigation, without the final judgment or decree being supported by the entire record upon which it is based. Such certified judgment or decree shall have the same force and effect as evidence as it would have if the entire record upon which it is based were filed with the judgment or decree, it being the intention to expedite the preparation of cases and save costs.

Tenn. Code Ann. § 24-6-101(a) (2000).

In essence, Father's argument is that the Plan and the April 20 Order were not properly admitted as evidence because they were not certified and, without the Plan and the April 20 Order, the Juvenile Court could not have found by clear and convincing evidence that grounds existed to terminate Father's parental rights.

While it is correct that the Plan and the April 20 Order were not self-authenticating documents because they were not certified, it is not correct that they were not admissible. While having the Plan and the April 20 Order certified would have been one way to authenticate those documents, certification was not the only way to authenticate them. Rule 901, Tenn. R. Evid. provides, in pertinent part:

> **Rule 901. Requirement of authentication or identification. –** (a) General Provision. – The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims.

-17-

(b) Illustrations. – By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) Testimony of Witness With Knowledge. – Testimony that a matter is what it is claimed to be.

* * *

(4) Distinctive Characteristics and the Like. – Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

* * *

(7) Public Records or Reports. – Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office (or a purported public record, report, statement, or data compilation in any form) is from the public office where items of this nature are kept.…

Tenn. R. Evid. 901.

Both the Plan and the April 20 Order were introduced at trial during the testimony of Ms. Bishop-Augusta, the DCS case manager. Ms. Bishop-Augusta identified both the April 20 Order and the Plan and testified in great detail about the Plan. The copy of the April 20 Order introduced at trial contains the signature of the Juvenile Court Judge and the DCS attorney as well as the stamp of the Hawkins County Circuit Court Clerk. As Ms. Bishop-Augusta testified in great detail that the Plan introduced at trial was what it claimed to be, the Plan was admissible into evidence. In addition, Ms. Bishop-Augusta testified that the April 20 Order was the order from the thirty-day hearing and, in addition to that, the April 20 Order contains signatures of the Juvenile Court Judge and counsel and the stamp of the Circuit Court Clerk and, as such, has sufficient indicia of reliability to support the Juvenile Court's finding that the April 20 Order was admissible. We find no abuse of discretion in the Juvenile Court's admission of the Plan or the April 20 Order.

We now turn to the issues raised regarding whether the Juvenile Court erred in finding that grounds existed to terminate Father's and Mother's parental rights. Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code

Ann. § 36-1-113(c)).  Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)).  "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.*  (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child.  Tenn. Code Ann. § 36-1-113(c).  Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).  Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence.  Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*.  Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We next address whether the Juvenile Court erred in terminating Father and Mother's parental rights due to willful failure to visit or having only token visitation with the Children in the four months immediately preceding the filing of this action pursuant to Tenn. Code Ann. § 36-1-113(g)(1).  As pertinent to this issue, Tenn. Code Ann. § 36-1-113(g)(1) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2007). In pertinent part, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit….

\* \* \*

(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;…

Tenn. Code Ann. § 36-1-102(1) (2005).

The Juvenile Court found that clear and convincing evidence existed to support grounds for termination under Tenn. Code Ann. § 36-1-113(g)(1) and specifically found and held:

The proof shows that in the four months immediately preceding the filing of this action that [Father and Mother] visited the children only one hour per month and with the time that was available to visit the Children, this amounts to only token visitation. The Department of Children's Services, provided supervised visitation, initially through the department and then through Solutions. Proof showed that [Father and Mother] and Solutions had established a procedure where [Father and Mother] were to call and set up visitation through the Solutions case worker. The case worker for Solutions testified that [Father and Mother] did not call. There was no evidence that there was any impediment to keep them from visiting the Children. The failure to visit was willful.

Father argues, in part, that he was prevented from visiting the Children during the last month of the relevant four month period because the Juvenile Court had entered an order suspending visitation. This argument is disingenuous. The Petition was filed on September 25, 2006 so the relevant four month period was from May 25, 2006 through September 25, 2006. The order suspending visitation was not entered until September 27, 2006. Although the hearing on the motion

-20-

to suspend visitation was held on August 31, 2006, Father did not attend this hearing. There is no evidence in the record showing that Father had notice until after the entry of the order that visitations were suspended. Father's visitations were suspended due to Father's own actions in using illegal drugs. At most, during the relevant four month period Father was prevented by court order from visiting the Children only from August 31, 2006 through September 25, 2006, and the record is devoid of evidence showing that Father even attempted to exercise visitation during this time period. Rather, the evidence shows that Father's visitations were sporadic and token even before the hearing on the motion to suspend visitation.

The evidence does not preponderate against the findings made by the Juvenile Court that clear and convincing evidence existed to terminate Father and Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(1). Even if we are in error in this holding given the suspension of visitations as discussed above, other grounds for terminating Father and Mother's parental rights were proven by clear and convincing evidence as we next discuss.

We now consider whether the Juvenile Court erred in terminating Father and Mother's parental rights for failure to provide a suitable home for the Children. As pertinent to this issue, Tenn. Code Ann. § 36-1-102 provides:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> * * *
>
> (ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date;…

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2005).

The Juvenile Court found that clear and convincing evidence existed to terminate Father and Mother's parental rights to the Children for failure to provide a suitable home and specifically found with regard to this issue:

The proof shows that since the children were removed form (sic) [Father and Mother's] home on January 26, 2006, that at no time have either [Father] or [Mother] together, or individually, provided their children a suitable home. Specifically, [Father and Mother] failed to provide a suitable home in the four months following removal of the children from their home. Proof shows that [Mother] has gone back and forth between her husband and three different boyfriends and has not had housing that was stable when she was with the boyfriends. When she was with [Father], testimony of the maternal grandmother and each of the state's witnesses was that there was domestic violence in the home and that the children were at risk because of this behavior. While apart, proof showed that [Father] had no suitable housing and in fact was living with his mother at the hearing. [Father] offered no evidence to dispute this claim.

The evidence does not preponderate against these findings as made by the Juvenile Court that clear and convincing evidence existed to support the termination of Father and Mother's parental rights for failure to provide a suitable home.

Next we consider whether the Juvenile Court erred in terminating Father and Mother's parental rights due to substantial noncompliance with the Plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2). As pertinent to this issue, Tenn. Code Ann. § 36-1-113(g)(2) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:

* * *

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2007).

With respect to this issue, the Juvenile Court specifically found:

The proof shows that a permanency plan [f]or the three children was developed on March 9, 2006. This plan required [Father and Mother] to 1. Provide documentation that they are physically able to care for their children, including a release of medical records and a signed statement that they are following their medical providers' prescribed treatment; 2. To demonstrate the ability to consistently meet their children's financial needs for six months and ongoing; 3. To maintain sobriety for at least three months, in part to assist in an Alcohol and Drug assessment; 4. To have [Father and Mother's] mental health needs assessed and follow-up as determined appropriate and participate in random drug testing; 5. Demonstrate the ability to care for their children; 6. Refrain from illegal activity; and, 7. Demonstrate the ability to control their behavior in a manner that doe[s] not place either of the children or them

at risk. The proof further shows that [Father and Mother] understood the conditions of the permanency plan and the criteria for termination of parental rights, having the criteria explained to them by the Court at the adjudicatory hearing and by DCS.

The proof shows [Father and Mother] had had a previous parenting assessment from when the children had been previously removed, but nothing else was accomplished toward requirement 1. Specifically there was no evidence that medical releases were signed or any signed statements from their medical providers. As for demonstrating the ability to meet the financial needs of the children, the proof shows there was no evidence provided to the Department of Children's Services that [Father and Mother] collectively or individually were working, were paying their bills, or were making payments for housing. In fact evidence showed that the foster parents had to pay back bills for daycare incurred by [Father and Mother]. The proof also shows that both parents failed drug tests in March 2006 and August 2006, further the testimony of [Mother] was that she and [Father] had used drugs while they were together. They also failed to complete an alcohol and drug assessment as was required by the permanency plan. The proof shows [Father and Mother] also failed to have their mental health needs assessed even though the Department of Children's Services made appointments to aid them in obtaining TennCare to pay for the assessment. Further the Court finds that although [Mother] and [Father] participated in some drug testing, the tests were positive for illegal drugs. As for demonstrating the ability to care for the children, the proof shows that [Father and Mother] failed to participate in marriage counseling, that there was a marked difference between the condition of the children while the parents had the children that they were dirty, had lice problems, skin problems and were not prepared for class and the educational needs of the children were not being met. The testimony of [Mother] was that she was arrested within two weeks of the permanency plan being established and also that she and [Father] were using cocaine, an illegal activity. The proof shows that [Father and Mother] did not refrain from criminal activity. As to demonstrating the ability to control their behavior so as to not put the children or themselves at risk, the proof shows that [Father and Mother] continued to engage in domestic violence, buy and use illegal drugs, [Father and Mother] have each failed to comply with the requirement to demonstrate that they can control their behavior such as not to put the children or themselves at risk.

The evidence does not preponderate against these findings made by the Juvenile Court that clear and convincing evidence existed to terminate Father and Mother's parental rights to the Children for substantial noncompliance with the Plan.

We next consider whether the Juvenile Court erred in terminating Father and Mother's parental rights for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3), which provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:

-23-

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2007).

With regard to this issue, the Juvenile Court specifically found:

The proof shows that the children were removed from [Father and Mother's] home because [Father and Mother] could not provide a safe and stable home for the children. Testimony from the maternal grandmother and from the Solutions case worker, and from the Department of Children's Services personnel showed that there was frequent domestic violence. Further proof showed that there was no marital housing as [Father and Mother] were being evicted at the time of removal. The proof shows that that (sic) there is no marital housing now, and that [Father] is residing with his mother, while [Mother] is living with a boyfriend and that his name is on the lease. She is therefore not in control of the housing. The conditions that necessitated removal still exist and the behavior of [Father and Mother] is such that these conditions will not be rectified any time soon.

The evidence does not preponderate against these findings made by the Juvenile Court that clear and convincing evidence existed to terminate Father and Mother's parental rights to the Children for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

Mother raises as an issue on appeal that termination of her parental rights was not proper because DCS failed to make reasonable efforts to assist Mother and Father. As this Court stated in *State of Tennessee, Department of Children's Services v. S.M.D.*:

The State "must make reasonable efforts to preserve a family before seeking to terminate parental rights." *In re: Jeremy D. and Nathan D.*, No. 01-A-01-9510-JV-00479, 1996 Tenn. App. LEXIS 292, at **7-8, 1996 WL 257495, at *3 (Tenn. Ct. App. May 17, 1996), *no appl. perm. appeal filed*. However, "[r]eunification of a

family is a two-way street, and the law does not require DCS to carry the entire burden of this goal." *In re: R.C.V. and O.V.*, No. W2001-02102-COA-R3-JV, 2002 Tenn. App. LEXIS 811, at *39, 2002 WL 31730899, at *11 (Tenn. Ct. App. Nov. 18, 2002), *no. appl. perm. appeal filed*.

*State of Tennessee, Department of Children's Services v. S.M.D.*, 200 S.W.3d 184, 197-98 (Tenn. Ct. App. 2006).

The evidence shows that Mother and Father were both fully aware of what they needed to do in order to regain custody of the Children. Mother testified that she was present when the Plan was entered into, she was not impaired, she understood the Plan, and that she even had a copy of it. In addition, the evidence in the record on appeal shows that Mother and Father had successfully worked a permanency plan previously and regained custody of the Children. The evidence shows that Father and Mother failed to apply for TennCare and have assessments done by Frontier Health despite the fact that Ms. Bishop-Augusta had set up appointments for them. The evidence shows that Mother and Father failed to keep DCS and CASA apprised of their whereabouts and failed to show any proof of employment or even of any attempts to secure employment. The record is devoid of any evidence showing that Mother or Father were incapable of working. The evidence also shows that Mother and Father continued to use illegal drugs and engage in other illegal behaviors. DCS was not required to carry the entire burden of attempting to reunite this family and the evidence shows that Mother and Father made little or no effort toward reunification.

The Juvenile Court implicitly found that DCS had made reasonable efforts in this case to reunite this family. The evidence does not preponderate against this finding as the evidence shows that DCS did make reasonable efforts given the facts and circumstances of this case.

Although neither Father nor Mother raise an issue regarding whether the Juvenile Court erred in finding that it was in the best interest of the Children for their parental rights to be terminated, we must necessarily consider this issue. *E.g., In re F.R.R., III*, 193 S.W.3d at 530. The Juvenile Court found that clear and convincing evidence existed that it was in the best interest of the Children for Father's and Mother's parental rights to be terminated and specifically found:

Proof shows that the children are in an adoptive home. It is in the best interest of the children that the parental rights of [Father and Mother] be terminated so they can be adopted into a home where they have stable and safe housing. It is in the children's best interest that they be adopted into a home that can provide for the children' financial needs. It is in the children's best interests that they be in [a] home free from criminal activity, unlike the home of their parents where the proof shows illegal drug usage and domestic violence happen frequently. It is in the children's best interest that they be in a home that sends them to school prepared to learn., (sic) unlike the home of [Father and Mother].

-25-

The evidence does not preponderate against the Juvenile Court's findings that clear and convincing evidence existed that the termination of Father and Mother's parental rights was in the best interest of the Children.

As grounds for termination were proven by clear and convincing evidence and clear and convincing evidence was presented that the termination of Father's and Mother's parental rights was in the best interest of the Children, we affirm the termination of Father's and Mother's parental rights to the Children.

## **Conclusion**

The judgment of the Juvenile Court is affirmed and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellants, B.C. and J.C., and their sureties, if any.

_____
D. MICHAEL SWINEY, JUDGE